# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| GENE SANCHEZ,<br><br>    Plaintiff,<br><br>  v.<br><br>ERIC ARNOLD,<br><br>    Defendant. | Case No. 17-cv-01155-BLF<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**<br><br>[Re: ECF 1] |

    Petitioner Gene Sanchez ("Petitioner"), a state prisoner represented by counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state criminal conviction of California Penal Code §§ 182(a)(1) (conspiracy to commit murder) and asserting two claims that his constitutional rights were violated.[1]  Petition ("Pet."), ECF 1.  After a Court Order to Show Cause (ECF 4), Respondent Eric Arnold ("Respondent") filed an answer, addressing the merits of Petitioner's claims, and exhibits in support thereof.  Answer ("Ans."), ECF 11-1; Exhibits A–H, ECF 11-3–16-9.  Petitioner filed a traverse in response.  Traverse ("Trav."), ECF 17.  Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief and DENIES the petition for writ of habeas corpus.

## I. BACKGROUND

    In 2011, Petitioner was tried (in a joint trial with three co-defendants) and convicted in Santa Clara County Superior Court.  A jury found Petitioner guilty of the one count charged, conspiracy to commit murder (§ 182(a)(1))[2].  16 Clerk's Transcript on Appeal ("CT") 4020, Ex. A

---

[1] This matter was reassigned to this Court on January 12, 2018.

[2] Statutory references throughout this opinion are to the California Penal Code unless otherwise noted.

1    to Ans., ECF 12-6.  The charge also included an enhancement for street gang association (§

2    186.22(b)).  *Id.* at 4019.  On August 19, 2011, the trial court sentenced Petitioner to a prison term

3    of 50 years-to-life consecutive to five years.  *Id.* at 4154–55.

4           Petitioner appealed and, on December 11, 2014, the California Court of Appeal issued a

5    written opinion denying relief and affirming the judgment.  *See* Opinion ("Op."), ECF 16-9, Ex. F.

6    On March 11, 2015, the California Supreme Court granted Petitioner's petition for review,

7    deferring further action in the matter pending consideration and disposition of a related issue

8    before it in a separate case.  *See* ECF 16-9, Ex. G.  On September 21, 2016, the California

9    Supreme Court dismissed the petition.  *See id.*

10          On March 6, 2017, Petitioner filed the instant federal petition for writ of habeas corpus in

11   this Court, asserting two claims that his Sixth Amendment Confrontation Clause and Fourteenth

12   Amendment Due Process rights were violated during his trial.  ECF 1.

## II.    SUMMARY OF EVIDENCE

           In its written opinion, the California Court of Appeal fairly and accurately summarized the

factual background of Petitioner's case at trial as follows:

### A. El Hoyo Palmas and Affiliated Gangs

Over defendants' objections, John Mendoza testified as an expert in the area of
Nuestra Familia, Nuestra Raza, and Norteño criminal street gangs. Mendoza, a
former member of the Nuestra Raza and Nuestra Familia gangs, testified in
exchange for a reduction in his sentence. According to Mendoza, Norteños (or
Northerners) are members of street gangs that identify with Northern California.
Nuestra Familia began as a prison gang and is at the top of the Norteño gang
hierarchy. Nuestra Raza, also a prison gang, is subordinate to Nuestra Familia.
Norteño street gangs, including El Hoyo Palmas (Palmas), fall under the Nuestra
Familia umbrella. In prison, all Northerners report to Nuestra Familia. Mendoza
testified that gang members gain respect by committing acts of violence, which
they may brag about in custody. Sureños, or Southerners, and Norteños are rivals.
Norteños refer to Sureños as "scraps," and "scrap hunting" refers to going out to
attack or kill Sureños.

Evidence was presented that defendants were Palmas members. For example,
witnesses identified photographs in which defendants could be seen in front of
Palmas graffiti, wearing clothing associated with the gang, or making gang signs.
Police searches also found clothing associated with Palmas in defendants'
possession. As discussed further below, San Jose Police Department Detective

2

Anthony Kilmer testified over defendants' objection as an expert on Norteño street gangs and Palmas in particular. He opined that all of the defendants were members of Palmas based on their tattoos, items found at their homes and on their computers, and/or police reports documenting their prior contact with law enforcement. Defendants did not dispute their gang membership at trial.

In addition to Mendoza, three other former gang members testified as part of plea bargains. Vince Tirri, a former Nuestra Raza member, testified as part of a plea deal that reduced his exposure from life to a range of seven to 19 years. As discussed in detail below, Tirri testified to several incriminating statements Espana made about the charged offenses while he and Tirri were in custody together. Tirri also testified to his impression that Sanchez, whom he met while neither was incarcerated, was a leader and influential member of Palmas who felt responsible for younger gang members.

Hector Delreal, a member of Palmas who was involved in some of the charged offenses, also testified as part of a plea deal. His testimony implicating the defendants is discussed below.

Joseph Abeyta, a former member of both Nuestra Raza and Palmas, testified to incriminating statements Espana made about the charged offenses while in custody. Specifically, he testified that Espana was being teased for being a virgin and another inmate and Norteño joked, "Yeah, ... he's a virgin with hot ones under his belt," which Abeyta interpreted to mean Espana had committed murders. According to Abeyta, Espana did not deny the suggestion that he was a murderer. On cross-examination, Abeyta acknowledged that Espana could not have contradicted the inmate who made the "hot ones" comment due to their relative rank in the Norteño hierarchy. Espana objected to the admission of Abeyta's description of the conversation on hearsay grounds. The court ruled the testimony was admissible as an adoptive admission.

**B. Firearms Evidence**

Police recovered three firearms, each of which was used in one or more of the charged offenses, which are described in detail below.

On March 1, 2007, police seized a .25–caliber pistol during a probation search of a residence. Delreal testified that another Palmas member left the gun in his car on February 28, 2007. As discussed below, that firearm was used in the shootings on Richmond Avenue (count 2), Hamilton Avenue (counts 3 & 4), and Waverly Avenue (counts 7 & 8).

On March 17, 2007, an officer investigating a loud party saw Castro, Espana, and a third man standing near a minivan. The officer seized a .357 revolver that he saw underneath the front tire of the minivan. The gun did not belong to the owner of the residence and minivan. That firearm was used in the Hamilton Avenue shooting (counts 3 & 4).

Castro, Espana, and Rojas were arrested on March 30, 2007. After Rojas, who

3

fled from police, was apprehended, an officer located a nine-millimeter Smith & Wesson pistol along the path Rojas had taken when he fled. That firearm was used in the shootings on Waverly Avenue (counts 7 & 8), San Tomas Aquino Parkway (counts 9 & 10), Poco Way (counts 11, 12, & 13), Virginia Avenue (count 14), and Giusti Drive (count 15).

## C. Murder of Palmas Member Cesar Gonzalez

Early on the morning of December 3, 2006, Cesar Gonzalez was shot and killed by, police suspect, a Sureño gang member. According to Detective Kilmer, Gonzalez was a member of Palmas. Delreal testified that there was an emergency meeting of Palmas members at defendant Sanchez's house on the evening of December 3, 2006. That meeting was attended by defendants Castro and Rojas, Pete Washington, possibly defendant Espana, and others. According to Delreal, Sanchez asked who was willing to "go do stuff," which Delreal interpreted to mean shoot Sureños in retaliation. Delreal testified that he, Castro, Rojas, and others volunteered. Following the meeting, Castro and Delreal met at a gas station where Castro told Delreal to go to the east side of San Jose and said he would go to the west side.

## D. December 3, 2006 Shootings

### 1. McCreery Avenue Shooting

Delreal testified that on the evening of December 3, 2006, following the meeting at Sanchez's house and his discussion with Castro, he and two other Palmas members went to McCreery Avenue on the east side of San Jose looking for Sureños. They shot at a group of men, hitting Jesus Ayala, a Sureño gang member.

### 2. Richmond Avenue Shooting

Meanwhile, according to Delreal, Castro went to the west side of San Jose in his Toyota Tacoma truck. Castro drove a green Toyota extra cab pickup that, according to an officer who conducted surveillance on Castro, looked darker and more blue in color in certain light.

Ivan Sandoval, a Sureño gang member, was shot outside an apartment complex on Richmond Avenue on the evening of December 3, 2006. Sandoval testified that the shooter was in a black or grayish truck. One of the individuals in the truck, who Sandoval identified as Washington, asked Sandoval if he was a Sureño by saying, "Sureño rifa; right?" Sandoval responded that he was and Washington began shooting. Sandoval testified that he knew Washington from juvenile hall.

Witness Shareen Nassarllah testified that the shooter was in the passenger seat of a passing truck. The shooter asked Sandoval, "Sur trece, que no?" Sandoval answered, "Yeah," indicating he was a Sureño, and was shot. Venancio Escobar, who also was shot in the incident, testified that the shots came from a dark green pickup truck. Another witness, Tony Guillen, testified that the shooter was in a

greenish four-door truck. The officer who responded to the shooting testified that, on his way to the scene, he passed a dark green Toyota pickup truck.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed casings found at the scene of the Richmond shooting and determined that they were fired by the .25–caliber pistol recovered by police on March 1, 2007. Delreal testified that he had seen Castro with that gun a couple of months before it was left in his vehicle in February 2007.

Castro was charged with attempted murder (Pen.Code, §§ 187, 664, subd. (a), count 2) [FN omitted] of Sandoval.

### E. December 14, 2006 Hamilton Avenue Shooting

Juan Perez testified that he and several other men were outside his Hamilton Avenue home at about 9:30 p.m. on December 14, 2006, when two people with hoods over their heads approached and asked if the men were Sureños. Perez answered that they were not and the hooded men then shot, killing Luis Medina and injuring Juan Payan. On April 12, 2007, Perez picked Washington out of a photo lineup as one of the shooters.

Fernando Reyes, who lived near the scene of the shooting, testified that after hearing gunshots he saw three men run away from Hamilton and get in a light blue pickup truck, which he believed to be a Nissan king cab. Reyes testified that a picture of Castro's truck looked "more or less similar to the one" he saw, but he noted differences in the wheel rims and windows.

Delreal testified that while he and Castro were cellmates in jail, Castro admitted that he was present at the Hamilton Avenue shooting and "just ... drove." Delreal testified that Rojas also discussed a shooting on Hamilton while in custody. According to Delreal, Rojas said that he approached a group of Sureños and shot at them with a nine-millimeter pistol and that two people were shot, one of whom died.

Jeremy Rosario, Washington's roommate and close friend, testified that Washington—who died on February 27, 2007—was a member of Palmas. Rosario testified that Washington said he was involved in a shooting near Hamilton and that Castro was there as well.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed casings found at the scene of the Hamilton Avenue shooting and determined that they were fired by the .25–caliber pistol recovered by police on March 1, 2007 and the .357–revolver recovered by police on March 17, 2007.

Castro was charged with the murder of Medina (§ 187, count 3) and attempted murder of Payan (§§ 187, 664, subd. (a), count 4).[FN2]

> [FN2] Espana also was charged in counts 3 and 4, but the People dismissed those counts as to him during trial.

5

## F. January 20, 2007 Waverly Avenue Party Shooting

There was a party on Waverly Avenue, which is in a Norteño neighborhood, on January 20, 2007. Both Sureños and Norteños attended the party. A fight ensued. Shots were fired from the front of the house and Jose Romero and Marcos Lomeli, a Sureño gang member, were wounded.

Manuel Amaya, a Sureño, testified that he arrived at the party with other Sureños. Because he was dressed like a Sureño, a number of Norteños standing in the front yard called him a scrap. Some individuals said "Norte Palmas" and told Amaya and his friends to leave, but they did not. Later, someone asked Amaya if he was a scrap. He answered he was a Sureño and the man hit him in the face with a beer bottle. Amaya identified a member of Palmas as the man who hit him. Shortly thereafter, the lights went out and there was shooting. Amaya did not recognize any of the defendants as having attended the party.

Jose Cervantes, another Sureño who attended the Waverly party, testified that he heard people at the party yelling "Norte" and "Palmas."

Partygoer Janet Ayala was interviewed by police in April 2007. At that time, Ayala picked Sanchez, Espana, and Castro out of photo lineups and indicated they were at the Waverly Avenue party. She also told the officer that she thought Castro had said "Why is there a scrap party being thrown in my hood?" On cross-examination, Ayala said she never personally heard anyone say "Why is there a scrap party being thrown in my hood," but heard from others that someone said that. She also indicated that she was never positive that the men she identified were at the party, but only thought they looked at little bit like people she saw there.

In April 2007, another partygoer, Sergio Crisostomo, identified Castro in a photographic lineup as having been at the party.

Yesenia Ramirez, who also attended the Waverly party, testified that the gunshots came from a vehicle, but said she could not describe it. On the night of the shooting, however, she told police that the shots were coming from two vehicles, one of which she described as a dark blue or dark green pickup truck.

Delreal testified that Rojas told him that he, Espana, and Castro were at the party on Waverly Avenue. Rojas told Delreal that, upon seeing Sureños, they left to get their guns and came back and shot into the party. Rojas admitted to Delreal that he was one of the shooters. Delreal further testified that he lived just down the street from the location of the Waverly shooting. On the night of the shooting, Castro called Delreal and said "some stuff happened by your house." Shortly thereafter, Castro, Espana, Rojas, and another Palmas member arrived at Delreal's house and dropped off some hats with the letter "P" on them, which are associated with the Palmas gang.

A criminalist from the Santa Clara County Crime Laboratory testified that he

analyzed casings found at the scene of the Waverly shooting and determined that they had been fired by the nine-millimeter Smith & Wesson pistol recovered by police on March 30, 2007 and the .25–caliber pistol recovered by police on March 1, 2007.

Castro was charged with the attempted murder of Lomeli and Romero (§§ 187, 664, subd. (a), counts 7 & 8).

### G. January 27, 2007 San Tomas Aquino Parkway Shooting

Josafat Hernandez testified that on the night of January 27, 2007, he met two friends outside his apartment on San Tomas Aquino Parkway. One of the friends, Rigoberto Gonzalez (Rigoberto), got out of the car so that Hernandez could get into the backseat. Two men approached Rigoberto while he was standing outside the car and asked in Spanish what neighborhood he belonged to. Rigoberto answered: "I do not belong to a neighborhood" and was shot to death. Hernandez was shot in the leg. Hernandez testified that he recognized Espana "a little bit."

Alfonso Flores, who lived on San Tomas Aquino Parkway at the time of the shooting, testified that on January 27, 2007, he heard what sounded like firecrackers and screeching tires. He looked out the window and saw a dark-colored, extended-cab truck with its lights off backing up. When shown a picture of Castro's truck at trial, Flores said it looked like the truck he saw the night of the shooting.

Delreal testified that Rojas told him that he, Espana, and Washington were involved in a shooting near San Tomas Aquino Parkway. Rojas told Delreal that Washington approached an individual who was getting out of a car, asked if he was a Sureño, and then shot the individual. Rojas shot the man after he was on the ground and Espana drove them away in Castro's truck. Castro was not there because he was with his girlfriend.

Jeremy Rosario testified that Washington said he shot someone at San Tomas Aquino Parkway and that Espana was present.

The first 911 phone call regarding a shooting occurred at 11:11 p.m. Cell phone records indicated that, around that time, Rojas's cell phone connected to a cell tower within a mile of the shooting, and then moved to the east side of San Jose. Rojas lived on the south side of the city, which is not in the vicinity of the shooting. Cell phone records further showed that, at about 10 minutes prior to the shooting, Espana's cell phone connected to a cell tower within two miles of the crime. At 11:18 p.m.—seven minutes after the first 911 call—Espana's phone connected to a cell tower nine miles from the crime scene towards east San Jose.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed nine-millimeter casings found at the scene of the San Tomas Aquino Parkway shooting and determined that they were fired by the nine-millimeter Smith & Wesson pistol police recovered on March 30, 2007.

Rigoberto's mother testified that Rigoberto and his half brother Gustavo were fighting over property before Rigoberto was killed. She testified that she believed Gustavo had killed Rigoberto. Gustavo testified that he was not involved in Rigoberto's death, but acknowledged the two had been fighting.

Castro, Espana, and Rojas were charged with the murder of Rigoberto (§ 187, count 9) and attempted murder of Hernandez (§§ 187, 664, subd. (a), count 10).

### H. February 5, 2007 Poco Way Shooting

On the afternoon of February 5, 2007, Alberto Jose Avalos, Arturo Amezquita, and Victor Castaneda were fired on by two men while parked in a white Jetta on Poco Way. At trial, Amezquita identified Rojas as one of the shooters and testified that he recognized Rojas because the two sat next to each other during a school placement exam prior to the shooting. An adult education placement program registrar testified that both Amezquita and Rojas were registered for a placement test that was conducted on January 9, 2007. Avalos and Amezquita testified that they had seen the shooters earlier that day while they were driving around. Avalos said the men had thrown Norteño gang signs at that time and that he had thrown a Sureño gang sign.

Delreal testified that he was involved in the Poco Way shooting. He was driving with Rojas and another Palmas member when Rojas saw some Sureños he had "gotten into it with" in a white Jetta. When the Jetta turned onto Poco Way, Delreal dropped Rojas and the other Palmas member off. He saw them shoot into the Jetta.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed four casings found at the scene and determined that two were fired by the nine-millimeter Smith & Wesson pistol police recovered on March 30, 2007.

Rojas was charged with attempted murder of Alberto Jose Avalos, Arturo Amezquita, and Victor Castaneda (§§ 187, 664, subd. (a), counts 11, 12 & 13).

### I. Pete Washington's February 27, 2007 Death

On February 27, 2007, Pete Washington was found dead from a gunshot wound to his right temple in the room he shared in a transitional home with Jeremy Rosario.

Another resident of the transitional home, Johnathan Ashley, testified that Rosario arrived home on the evening of February 27, 2007 and he went into the room he shared with Washington. Rosario became upset when he realized something was wrong with Washington. Ashley went into the room and saw Washington lying on his bed with a gun near him and blood on his pillow. Ashley said he told Rosario to move the gun.

The officer who interviewed Rosario the night of Washington's death testified that Rosario was upset and crying. Rosario told the officer he had taken the gun out of Washington's left hand and put in on top of the refrigerator. Rosario

testified that he used a jacket to move the gun to avoid getting his prints on it. The gun was found in the pocket of a jacket on top of the refrigerator. Three latent fingerprints were found on the gun, all of which matched Rosario and none of which matched Washington.

Detective Sean Pritchard, who was investigating the Hamilton Avenue and San Tomas Aquino Parkway shootings, interviewed Rosario on March 20, 2007. Based in part on Rosario's statements, Detective Pritchard began surveillance of Sanchez and Castro.

### J. March 28, 2007 Virginia Avenue Shooting

A San Jose police officer testified that he responded to the scene of a shooting on Virginia Avenue at 7:52 p.m. on March 28, 2007. The officer found 15–year–old Edgar Martinez lying in the gutter with at least six gunshot wounds. Martinez, a Sureño, died. Officers found 10 shell casings at the scene.

Virginia Avenue resident Tom Quiroz testified that he heard gunshots on March 28, 2007. He looked out the front door and saw four men running. Three of the men jumped into a silver Dodge Stratus and sped away.

Castro's brother, Gilbert, drove a silver Dodge Stratus.

On March 31, 2007, Castro spoke with his other brother, Juan, at the police station and—in a conversation recorded by police—said he had driven the Stratus "the night the Virginia thing happened."

Delreal testified that, while he and Rojas were cellmates, Rojas discussed his involvement in the Virginia Avenue shooting. Rojas told Delreal that he, Castro, Espana, and another individual were out in Castro's brother's car. Rojas approached an individual and said he was from Palmas. The individual ran away and Rojas chased him and "unloaded the clip on him."

Tirri testified that, while in custody, Espana discussed being involved in a shooting outside an apartment building or house shortly before he was arrested on March 30, 2007. According to Tirri, Espana said that Castro was driving his brother's car, which Tirri said was "a Stratus, or some type of car like that."

San Jose Police Officer Jaime Jimenez was conducting surveillance on Castro at the time of the Virginia Avenue shooting. He testified that at the time of that shooting Castro's truck was parked at his residence but that the Dodge Stratus associated with that residence was not there.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed casings found at the scene and determined that they were fired by the nine-millimeter Smith & Wesson pistol police recovered on March 30, 2007.

Castro, Espana, and Rojas were charged with the murder of Edgar Martinez (§ 187, count 14).

### K. March 30, 2007 Giusti Drive Shooting

San Jose Police Officer James Hussey testified that he was surveilling Castro on the evening of March 30, 2007. According to Officer Hussey's testimony, shortly after 7:00 p.m. that evening, Castro and Rojas left Castro's home in the Toyota pickup truck and drove to pick up Espana. Two hours later, the truck parked in a parking lot near Snow and Giusti Drive and two individuals with hoods pulled up on their heads and exited the vehicle. They approached a man in blue mechanic's pants and an orange shirt who was working on a car. Officer Hussey testified that the three men appeared to be having a conversation and he thought he might be witnessing a drug deal. After about 30 seconds, he saw one of the hooded men point something at the mechanic and heard eight to 10 gunshots. The two men then ran to Castro's truck.

Multiple patrol cars surrounded the vehicle shortly after it pulled away. Castro remained in the vehicle and was arrested. Rojas and Espana got out of the vehicle and ran, but were apprehended a short distance away. A nine-millimeter Smith & Wesson pistol was found along the path Rojas took when he fled police. A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed casings found at the scene and determined that they were all fired from that gun.

Espana was handcuffed, searched, and made to sit on the pavement. After Espana had been moved to another location, an officer found the victim's wallet on the ground where Espana had been seated.

The victim, locksmith Hernan Koba, died of his wounds. A cell phone was found hanging around his neck. An expert in the area of forensic toxicology testified that there was methamphetamine in Koba's body at the time of his death in an amount suggesting he had been using the drug chronically.

Delreal testified that Rojas discussed the Giusti Drive shooting with him while they were cellmates. Rojas said that he, Castro, and Espana were out and that he and Espana approached Koba with the intent to rob him. According to Delreal, Rojas said Koba gave them his wallet but refused to give them the cell phone that was hanging around his neck, so Rojas shot him. Rojas admitted to Delreal that he ran from police and threw his gun while he was running.

Tirri testified that Espana said he shot Koba and that he approached him on the mistaken belief that he was a Sureño. Tirri informed Espana that he would not get "credit" for the killing because Koba was not a Sureño. Espana responded that he and his boys had already "dropped some bodies."

Castro's brother, Juan, testified that Castro told him he thought they were going to a party the night of the Giusti Drive shooting. Castro said he was parking when Rojas and Espana came running back to the car. They told him Rojas shot the victim because he refused to give them his wallet.

Rojas testified that the Giusti Drive shooting was the result of a drug deal gone bad. According to Rojas, Castro recognized Koba and wanted to buy drugs from him, so Rojas and Espana approached Koba to make a transaction. A fight over money ensued and Espana shot Koba, who looked like he was about to hit Espana. Back in Castro's truck, Rojas learned Espana had taken Koba's wallet and agreed to take the gun and clip from Espana to hide.

Castro, Espana, and Rojas were charged with the murder of Koba (§ 187, count 15).

## L. Detective Kilmer's Expert Testimony

As noted above, Detective Kilmer testified as an expert on Norteños and Palmas. Detective Kilmer opined that all of the following were carried out for the benefit of, at the direction of, and/or in association with the Palmas criminal street gang: (1) the December 3, 2006 Richmond Avenue shooting; (2) the December 14, 2006 Hamilton Avenue shooting; (3) the January 20, 2007 Waverly Avenue shootings; (4) the January 27, 2007 San Tomas Aquino Parkway shooting; (5) the February 5, 2007 Poco Way shooting; (6) the March 28, 2007 Virginia Avenue shooting; and (7) the March 30, 2007 Giusti Drive shooting and robbery. Detective Kilmer based that opinion on evidence that some of the victims were Sureños, that certain of the shootings occurred in known Sureño neighborhoods, and that such shootings generally convey a message that the gang is strong. Detective Kilmer's opinions were based, in part, on his review of police reports as well as conversations with other officers, gang intervention counselors, witnesses, and gang members.

Before trial, defendants moved in limine to exclude Detective Kilmer's testimony on the grounds that (1) the defense did not know the basis of some of his testimony and (2) portions of his testimony were based on out-of-court testimonial statements by witnesses (e.g., other police officers and gang members) who were neither present at trial, nor subject to cross-examination, in violation of their Sixth Amendment confrontation clause rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). The court rejected those arguments and denied defendants' motions in limine to exclude Detective Kilmer's testimony.

## M. Rosario's Additional Testimony and Cross-examination

In addition to his accounts of the Hamilton Avenue and San Tomas Aquino Parkway shootings, Jeremy Rosario testified more generally that Washington was a member of Palmas and was friends with all of the defendants, who also belonged to the gang. While Rosario was not a member of the gang, he considered Washington to be his best friend and he spent time with Washington and the defendants. Rosario testified that he had seen all of the defendants with guns and had overheard them discuss "scrap hunting." According to Rosario, Sanchez seemed to be the one encouraging or suggesting scrap hunting. Washington told Rosario that he sold cocaine and gave the money he earned doing so to Sanchez for gang expenses. Rosario testified about a specific incident in which he saw Sanchez ask a 15– or 16–year–old boy whether he was "down with their hood,"

and then gave the boy a gun and tell him to "blast" some Sureño gang members in a nearby park.

Near the beginning of his cross-examination, Espana's counsel asked Rosario if he had been truthful with the police during their investigation of Washington's death. Rosario responded with "What does this have to do with me finding my best friend dead and these fuckin' murderers?" Rosario further told Espana's attorney "You fuckin' disgust me. You are going to go home and sleep beautifully ... and I have to remember." The jury was excused from the courtroom and the trial court ordered the comments stricken on its own motion. Counsel for defendants objected to that ruling, arguing that Rosario's outburst was relevant to his credibility, bias, and attitude. The court nevertheless ordered the comments stricken as nonresponsive.

When cross-examination continued, Rosario provided some substantive responses but frequently answered questions "I don't remember," refusing to review any documents in an effort to refresh his memory. He also answered "sure" to many of the questions posed by the defense attorneys. Eventually, he explained that "sure" "sometimes" meant yes and "sometimes" meant no; it also meant "if that's what you wanna think." The defense attorneys were permitted to impeach Rosario with his prior statements to police and his grand jury testimony. Among other things, defense counsel questioned Rosario about statements he made to police about associating with a Sureño-affiliated gang in Santa Maria in 2008.

Outside the presence of the jury, counsel for defendants requested that Rosario's direct examination testimony be stricken of two grounds. First, they argued Rosario was an incompetent witness under Evidence Code section 701, subdivision (a)(1) because he lacked the ability to communicate in a meaningful manner. Second, they urged his conduct denied defendants the right to a fair trial and to confront a witness against them. The court refused to strike Rosario's testimony, reasoning that while Rosario was not "giving meaningful answers," he "did answer the questions" and he "was subjected to ... unlimited cross-examination."

### N. Indictment

On May 13, 2008, the grand jury returned a 17–count indictment against the four appellants and seven other codefendants. The charges against the seven other codefendants were dismissed or severed.[FN3] The indictment charged Sanchez, Castro, Espana, and Rojas with conspiracy to commit murder (count 1; § 182, subd. (a)(1)). It further charged Rojas of three counts of murder (counts 9, 14, 15), and four counts of attempted murder (counts 10–13); it charged Espana with four counts of murder (counts 3, 9, 14, 15) and two counts of attempted murder (counts 4, 10); and it charged Castro with four counts of murder (§ 187; counts 3, 9, 14–15) and five counts of attempted murder (§§ 187, 664, subd. (a); counts 2, 4, 7, 8, 10).[FN4] Each count included the gang enhancement allegation that defendants committed the charged crime for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members, within the meaning of

section 186.22, subdivision (b)(1)(C). Multiple murder and gang special circumstance allegations were also charged in connection with the murder charges (§ 190.2, subd. (a)(3), (a)(22)), and many of the charges included firearm allegations (§ 12022.53, subds. (b), (c), (d), (e)(1)). In connection with the murder of Hernan Koba charged in count 15, the indictment included a robbery special circumstance allegation (§ 190.2, subd. (a)(17)).

> [FN3] These included counts 5, 6, 16, and 17, which accordingly are not at issue here.

> [FN4] Counts 3 and 4 later were dismissed as to Espana.

**O. Guilty Verdicts and Sentencing**

The jury deliberated for more than seven days before returning verdicts of guilty on all counts and finding all allegations and enhancements to be true.

The trial court sentenced Sanchez to 50 years to life consecutive to five years. Rojas was sentenced to life without the possibility of parole, consecutive to life with the possibility of parole, consecutive to 175 years to life. Espana received a sentence of life without the possibility of parole, consecutive to life with the possibility of parole, consecutive to 100 years to life. The court sentenced Castro to life without the possibility of parole, consecutive to life with the possibility of parole, consecutive to 225 years to life.

Op. at 2–17.

## III. LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant the writ with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384–86 (2000), while the second prong applies to decisions based on factual determinations, *Miller–El v.*

*Cockrell*, 537 U.S. 322, 340 (2003).

As to the first prong, "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

As to the second prong, under the "unreasonable determination" clause, a federal habeas court must "presume the [state] court's factual findings to be sound unless [the petitioner] rebuts 'the presumption of correctness by clear and convincing evidence.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(e)(1)). "To show such an error occurred, the petitioner must establish that the state court's decision rested on a finding of fact that is 'objectively unreasonable.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004)). This standard is a "demanding" one, but it is "not

14

insatiable." *Dretke*, 545 U.S. at 240.

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion. *Ylst*, 501 U.S. at 804.

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. *See Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam); *Harrington v. Richter*, 562 U.S. 86, 96–101 (2011); *Felkner v. Jackson*, 562 U.S. 594 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner*, 562 U.S. at 598 (internal quotation marks and citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

## IV.    DISCUSSION

Petitioner asserts two claims in his petition: (1) his Sixth and Fourteenth Amendment rights to confrontation and due process were violated based on the trial court's admission of prosecution witness Jeremy Rosario's testimony though Rosario refused to submit to cross-examination; and (2) his Sixth and Fourteenth Amendment rights to confrontation and due process were violated based on the trial court's admission of hearsay statements as conveyed by expert witness Detective Anthony Kilmer as a basis for his gang-related expert testimony. Because the California Supreme Court summarily dismissed Petitioner's petition for review, ECF 16-9, Ex. G, this Court reviews the Court of Appeals decision for the respective claims. *See Ylst*, 501 U.S. at 803–04. The Court discusses each claim in turn.

### A.    Trial Court's Admission of Prosecution Witness Jeremy Rosario's Testimony Despite His Refusal to Submit to Cross-Examination

Petitioner argues that the state court's decision was contrary to or an unreasonable

application of clearly established Confrontation Clause law because the state court upheld the trial court's refusal to strike the testimony of prosecution witness Jeremy Rosario even though Rosario "largely refused to testify on cross-examination" by "feign[ing] memory loss," refusing to allow defense counsel to refresh his recollection (despite allowing government's counsel to do so), and "answering 'sure' to scores of questions and [telling] counsel to interpret those answers any way counsel wanted to." Pet. at 26.

On appeal, the state appellate court rejected Petitioner's claim that the admission of Rosario's testimony violated his rights:

> The state and federal Constitutions guarantee a criminal defendant the right to confront the witnesses against him. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15.) The primary purpose of confrontation is to secure the opportunity for cross-examination. (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1137; *United States v. Owens* (1988) 484 U.S. 554, 557 (*Owens*).) Defendants maintain Rosario's refrain of "I don't remember" and "sure" denied them their constitutionally guaranteed opportunity to cross-examine him. They maintain the trial court erred by failing to strike Rosario's direct testimony in its entirety. The People respond that Rosario's presence on the witness stand afforded defendants an adequate opportunity for cross-examination.

> A witness who "refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness." (*People v. Rios* (1985) 163 Cal.App.3d 852, 864; *see also Douglas v. Alabama* (1965) 380 U.S. 415, 422 [confrontation clause violation where witness refuses to testify at all on privilege grounds].) By contrast, a witness who suffers from memory loss—real or feigned—is considered "subject to cross-examination" because his presence and responses provide the "jury with the opportunity to see [his] demeanor and assess [his] credibility." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420 (*Gunder*) ["The circumstance of feigned memory loss is not parallel to an entire refusal to testify."]; *see also Owens, supra*, 484 U.S. at p. 559, 108 S.Ct. 838 [opportunity to cross-examine not denied where witness suffers from memory loss].)

> At issue here is whether Rosario is more akin to a witness who refuses to answer questions or one who feigns memory loss. We conclude that, despite Rosario's selective memory and evasiveness, the confrontation clause was satisfied because "'[his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony.'" (*People v. Homick* (2012) 55 Cal.4th 816, 861 (*Homick*), quoting *People v. Perez* (2000) 82 Cal.App.4th 760, 766.) We are not persuaded by defendants' contention that *Homick*, *Perez*, and *Gunder*, where the witnesses were equally forgetful on direct and cross-examination, do not apply because Rosario's memory loss did not manifest itself until cross-examination.[FN5] The

extent of a witness's memory loss does not impact the rationale underlying those decisions—namely, that the confrontation clause is not violated where the jury has the opportunity to observe the witness's demeanor and to assess his credibility. Indeed, if anything, the selective nature of Rosario's claimed memory loss reflected poorly on his credibility, thus benefiting defendants.[FN6]

> [FN5] In fairness, Rosario was a reluctant and forgetful witness throughout his testimony. However, he permitted the prosecutor to refresh his recollection, while denying defense counsel that opportunity.

> [FN6] *People v. Murillo* (2014) 231 Cal.App.4th 448 is not contrary. There, "'[t]he trial court allow[ed] the prosecutor to ask [a prosecution] witness more than 100 leading questions concerning the witness's out-of-court statements to prove defendant guilty of several criminal offenses.'" (*Id.* at pp. 449–450.) For example, the prosecutor asked the witness: "'Isn't it true ... that you were shown six photographs [in January] and asked whether you could identify anybody in those photographs?; [D]o you recall telling the detectives that it looks like, but you're not sure, [it is] number four [(*Murillo*)]?; [D]o you recall circling number four [(Murillo)] and putting your initials, the date, and the time on that document?; [D]o you recall writing a statement that says, "Number four [(Murillo)] looks like him, but not completely sure. Kind of the same face structure"?; [O]n page one of this exhibit, do you recall signing it under signature of witness in front of the detectives?'" (*Id.* at p. 451.) The witness refused to answer or said he had nothing to say. Our colleagues in the Second District concluded that the prosecutor's "questions create[d] the illusion of testimony[, which] deprived defendant of a fair trial because he could not exercise his constitutional right of cross-examination." (*Id.* at p. 450.) The court reversed, citing *Crawford*. (*Id.* at p. 455.) As noted, case law distinguishes between witnesses who feign memory loss and those who refuse to answer questions. Rosario fell into the former category, while the witness in Murillo fell into the later. And in Murillo the prosecutor essentially testified for the witness. That did not occur here; Rosario provided substantive responses and testimony.

> In addition to claiming memory loss, Rosario frequently responded with an equivocal "sure." Rosario's behavior was, in this regard, similar to that of the witness in *Homick* who "refused to answer questions ... and generally behaved in an uncooperative and childish manner." (*Homick*, *supra*, 55 Cal.4th at p. 855.) We see no practical difference between a witness who feigns lack of memory to avoid answering a question and one who provides a meaningless response like Rosario's admittedly hollow "sure." In both cases, while the witness's response "'narrow[s] the practical scope of cross-examination,'" there is no confrontation right violation because the jury has "'the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony.'" (*Id.* at p. 861.)

Op. at 18–20 (citations altered).

The state appellate court's decision was not contrary to and did not involve an

unreasonable application of clearly established federal law.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, though it is a procedural rather than a substantive guarantee. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination). The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. *Crawford*, 541 U.S. at 61; *see, e.g.*, *United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (noting that the Confrontation Clause serves to ensure that witnesses will testify under oath, to force witnesses to undergo cross-examination, and to permit the jury to observe the demeanor of witnesses). Confrontation Clause claims are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004); *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. 619, 637 (1993)).

Petitioner fails to identify any clearly established federal law to which the state court decision is contrary or which it unreasonably applied. Petitioner argues, at bottom, that admission of Rosario's testimony violated his right under the Confrontation Clause to have "an opportunity for effective cross-examination." Pet. at 30 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)). He alleges he was denied this opportunity by Rosario's feigned memory loss and recalcitrance. *Id.* at 30–31. In his Petition, he cites numerous Supreme Court cases that broadly define the right to effective cross-examination; however, he fails to point specifically to a single case with analogous, or even similar, facts. In his Traverse, Petitioner more explicitly argues that

he "relies on" *Douglas v. Alabama*, 380 U.S. 415 (1965). *See* Trav. at 2. According to Petitioner, the state court's decision was contrary to the holding in *Douglas*, which, in Petitioner's words, "held that admission of a prior statement by a witness who at trial claimed his Fifth Amendment right to not respond to questioning violated the defendant's right to Confrontation under the Sixth Amendment." *Id.*

But the state court considered *Douglas* and reasonably determined that Rosario's testimony (or lack thereof) was more akin to the testimony at issue in *United States v. Owens*, 484 U.S. 554, 555, 559–60 (1988), in which the Supreme Court held that the defendant's Confrontation rights had not been violated where the witness testified to an out-of-court identification but could not explain the basis for that identification due to memory loss. *See* Op. at 18–19. The state court noted that in *Douglas*, the "witness refuse[d] to testify at all" by claiming privilege for each question, whereas in cases like *Owens* involving memory loss, the witness is "considered 'subject to cross-examination' because his presence and responses provide the 'jury with the opportunity to see [his] demeanor and assess [his] credibility.'" *Id.* (alterations in original) (quoting *California v. Gunder*, 151 Cal. App. 4th 412, 420 (2007)) (citing *Owens*, 484 U.S. at 559). It then held that in this case, Rosario, "despite his selective memory and evasiveness," was more similar to the witnesses with memory loss than those who elect not to testify at all because the jury had "the opportunity to observe [his] demeanor and to assess his credibility." Op. at 20. It also held that Rosario's equivocal answer of "sure" was the same as feigning memory loss, in that it provided a "meaningless response" that still allowed the jury to evaluate Rosario's credibility and demeanor. *Id.* at 20.

Nothing about the state court's assessment of the facts and analogizing to *Owens* is an unreasonable application of the rule set forth in *Douglas*. The state court found that throughout his testimony Rosario "provided some substantive responses" and that "defense attorneys were permitted to impeach Rosario with his prior statements. Op. at 16. *See, e.g.*, 43 State Court Reporter's Transcript ("RT") at 2180–81, 2195–96; 44 RT 2219–21, 2225–26. And though Rosario frequently answered "sure" and "I don't remember" and refused to review documents to refresh his memory, the state court reasonably determined that these responses allowed the jury to

weigh Rosario's credibility and demeanor.  Indeed, the state court noted that "if anything, the selective nature of Rosario's claimed memory loss reflected poorly on his credibility."  Op. at 18.

The Court is not convinced by Petitioner's argument that *Douglas* controls here because "*Owens* involved a witness who has genuine memory loss, not feigned memory loss."  Trav. at 6.  Even if this were a meaningful distinction, Petitioner points to no Supreme Court case holding that feigned memory loss is somehow distinguishable from genuine memory loss for the purposes of the Confrontation Clause analysis.  This failure alone necessarily means that the state court's application of *Owens* and *Douglas* was reasonable.  But also, this distinction makes little sense under the reasoning of *Owens*, where the Court emphasized that "the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor" satisfy the constitutional requirements of the Confrontation Clause.  *Owens*, 484 U.S. at 560; *see Felix v. Mayle*, 379 F.3d 612, 617–18 (9th Cir. 2004), *rev'd and remanded on other grounds*, 545 U.S. 644 (2005) (holding state court decision was not contrary to clearly established law where the state court held that feigned memory loss was more similar to *Owens* than *Douglas*).  The state court reasonably determined that those same protections are available whether the memory loss at issue is feigned or genuine.  *See* Op. at 19.

Likewise, the Court is unconvinced by Petitioner's attempt to distinguish a witness's "total uncooperativeness" (*i.e.*, unwillingness or inability to answer questions from both government and defense counsel) from a "selective uncooperativeness" (*i.e.*, unwillingness to answer questions only from defense counsel), as is at issue here.  Trav. at 3.  The state court reasonably held that "[t]he extent of a witness's memory loss does not impact the rationale underlying th[e relevant] decisions."  Op. at 19.[3]  Moreover, the state court found that "Rosario was a reluctant and forgetful witness throughout his testimony," *id.* at 19 n.5, not just to defense counsel—a factual determination which this Court presumes to be correct under 28 U.S.C. § 2254(e)(1), absent clear and convincing evidence to the contrary.

---

[3] To the extent Petitioner also argues that the Supreme Court's decision in *Crawford*, 541 U.S. 36, overruled *Owens* as to the issue of memory loss and the Confrontation Clause, *see* Pet. at 28–29, Trav. at 6–7, Petitioner cites no clearly established Supreme Court law supporting that position.

For the foregoing reasons, the Court holds that the state court's affirmance of the admission of prosecution witness Jeremy Rosario's testimony was not an unreasonable application of or contrary to clearly established Supreme Court law.

**B.    Trial Court's Admission of Hearsay Statements as Conveyed by Expert Witness Detective Anthony Kilmer**

Petitioner also argues that the state court unreasonably upheld the admission of expert testimony on gangs by Detective Anthony Kilmer because, to support his opinion, Kilmer introduced out-of-court, testimonial, case-specific statements for the truth of the matters asserted, in violation of Petitioner's Confrontation Clause rights. *See* Pet. at 43.

On appeal, the state appellate court rejected Petitioner's claim that the admission of Kilmer's testimony violated his rights:

> In *Crawford*, the Supreme Court announced a new rule: the confrontation clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." (*Crawford*, supra, 541 U.S. at pp. 53–54, 124 S.Ct. 1354.) At trial, Detective Kilmer testified that his expert opinions were based, in part, on out-of-court statements, including police reports and conversations with gang members and other officers. Defendants argue those out-of-court statements—so-called "basis evidence"—were both testimonial and were offered for their truth, such that Detective Kilmer's testimony ran afoul of *Crawford*.

> Expert basis evidence implicates the confrontation clause only where the expert discloses or otherwise conveys to the jury the substance of testimonial out-of-court statements. (*U.S. v. Johnson* (4th Cir.2009) 587 F.3d 625, 635 (*Johnson*) ["An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation."]; *U.S. v. Lombardozzi* (2d Cir.2007) 491 F.3d 61, 72 [same]; *U.S. v. Gomez* (9th Cir.2013) 725 F.3d 1121, 1129 [same].) In the Supreme Court's fractured decision in *Williams v. Illinois* (2012) —— U.S. ——, 132 S.Ct. 2221 all nine justices agreed that it is the admission of the *contents* of out-of-court statements that raises potential confrontation clause concerns. (*Id.* at ——, 132 S.Ct. at p. 2228 (plur. opn. of Alito, J.) ["[o]ut-of-court statements that are *related by* the expert solely for the purpose of explaining the assumptions on which that opinion rests"], italics added; *id.* at p. ——, 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.) ["the *disclosure* of Cellmark's out-of-court statements through the expert testimony"], italics added; id. at ——, 132 S.Ct. at p. 2267 (dis. opn. of Kagan, J.) [considering whether "the *substance* of the report could come into evidence"],

italics added.) Our own high court's recent decisions involving the intersection of the confrontation clause and expert basis evidence likewise demonstrate that Sixth Amendment concerns arise only where an expert witness communicates the substance of an out-of-court statement. (*People v. Dungo* (2012) 55 Cal.4th 608, 622 (conc. opn. of Werdegar, J.) [considering whether an expert's "repetition to the jury of anatomical and physiological observations [a pathologist] recorded in his [autopsy] report," on which the expert based his opinions, violated the confrontation clause]; *People v. Lopez* (2012) 55 Cal.4th 569, 576 [considering whether criminalist's testimony about the "contents" of a nontestifying analyst's laboratory report "violated defendant's right to confront [the analyst] at trial"].)

Thus, as a threshold matter, defendants must establish that Detective Kilmer conveyed the contents of out-of-court statements to the jury. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574–575 [party challenging judgment has burden to show reversible error].) This they fail to do. Defendants point to Detective Kilmer's testimony that his opinions were based, in part, on (1) in-custody and on-the-street conversations with gang members in which they voluntarily told him about gang rivalries as well as their lifestyle, customs, and motivations; (2) discussions with probation and parole officers about gang members who are on probation or parole; and (3) conversations with officers in other agencies in Santa Clara County about gang problems and gang members. But defendants cite no testimony in which Detective Kilmer disclosed "the content of those [conversations] or even stated with any particularity what [he] learned from those [conversations]." (*Johnson*, supra, 587 F.3d at p. 636 [finding no confrontation clause violation where expert relied on interviews with witnesses and cooperating defendants without referencing the substance of those interviews].) Defendants also complain that Detective Kilmer based his opinion that predicate offenses were committed by Palmas members on police reports and conversations with other officers. Again, however, our review of the record indicates Detective Kilmer never revealed the substance of those reports or conversations.

Because Detective Kilmer did not relate statements by out-of-court declarants to the jury, the admission of his testimony did not violate defendants' confrontation rights. We need not reach the questions of whether any of the out-of-court statements on which Detective Kilmer relied were testimonial or offered for their truth.[FN7]

[FN7] Incidentally, even if we attempted to address those issues, defendants' failure to point to specific out-of-court statements Detective Kilmer relayed to the jury would derail our analysis. Whether a particular out-of-court statement is testimonial is highly fact-specific. (*Michigan v. Bryant* (2011) 131 S.Ct. 1143 ["In determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances."].) Given the record's silence as to the circumstances surrounding the various conversations on which Detective Kilmer relied, we would be required to resolve the issue against defendants. (*See Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 ["'All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown.'"].)

Op. at 26–28 (citations altered).

Petitioner challenges the state court's holding on three bases. First, Petitioner challenges the state court's primary holding: that Kilmer did not introduce the contents of out-of-court statements to the jury. *See* Pet. at 43. Petitioner does not argue that this holding is contrary to or an unreasonable application of clearly established law. Instead, he argues that this was an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2) because Kilmer did reveal the contents of certain statements. He then argues that these statements were introduced for the truth of the matters asserted as clearly established under *Williams v. Illinois*, 567 U.S. 50 (2012). Second, Petitioner challenges the state court's secondary holding: that Petitioner failed to raise sufficient evidence to demonstrate that any purportedly introduced statements were "testimonial" so as to violate his Confrontation Clause rights. *See* Pet. at 56–57. Relying on *Davis v. Washington*, 547 U.S. 813 (2006), *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011), and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308 (2009), he argues that the state court unreasonably determined that the statements on which Kilmer relied were not testimonial. Finally, Petitioner argues that these errors were not harmless, but instead had a substantial and injurious effect on the verdict under *Brecht*, 507 U.S. 619.

Petitioner's first argument—that the state court unreasonably determined that Kilmer did not reveal the content of certain statements—has some merit. The state court did not explicitly conduct a statement-by-statement review of Kilmer's testimony, but it appears from the record that Kilmer may indeed have introduced the contents of certain statements to the jury, either by recounting portions of those statements himself or by affirming the statements as recounted in questions by the prosecutor. However, this Court need not decide whether the state court's factual determination was unreasonable, because to succeed here Petitioner must also win on his second argument—that the state court unreasonably held that Petitioner failed to demonstrate that Kilmer's introduced statements were testimonial. This he cannot do. This holding by the state court was neither an unreasonable determination of the facts nor contrary to or an unreasonable application of clearly established law. Because this holding is dispositive, this Court need not reach Petitioner's other arguments.

23

As discussed above, the Confrontation Clause of the Sixth Amendment gives a criminal defendant the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford*, 541 U.S. at 51, the Supreme Court made clear that a witness is anyone who bears testimony against the defendant. As such, statements that are "testimonial," even when made outside the courtroom, are subject to the Confrontation Clause's mandates. Such statements include, but are not limited to, those made as "prior testimony at a preliminary hearing, before a grand jury, or at a former trial" and those made during certain "police interrogations." *Id.* at 68. Since *Crawford*, the Supreme Court has continued to develop guidelines for determining when a statement is testimonial. In *Michigan v. Bryant*, 562 U.S. 344, 358 (2011), the Court made clear that statements are testimonial when they are "procured with a primary purpose of creating an out-of-court substitute for trial testimony." This test is an objective one. *Id.* As to police interrogations (including street encounters), the *Bryant* Court held that courts must "objectively evaluat[e] the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs" to determine the primary purpose for soliciting the statement. *Id.* at 370. Likewise, one additional factor to consider is the formality of the situation and the interrogation. A "formal station-house interrogation . . . is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." *Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015) (internal quotation marks omitted). In any scenario, the question of whether a statement is testimonial is fact-specific. *See Bryant*, 562 U.S. at 370.

Petitioner points to several categories of statements introduced by Kilmer that he believes were testimonial. *See* Pet. at 48–52. First, Petitioner notes that Kilmer relied on police reports and field investigation cards that detail various "police contacts" with Petitioner and others. *See, e.g.*, 125 RT 7639–40, 7655–59, 7661–65, 7667. Second, Kilmer had conversations with other officers and witnesses in the case (including Jeremy Rosario and Hector Delreal) about various facts, including the gang affiliations in the area where the January 20, 2007 meeting took place, the fact that some gang members often frequented Pete Washington's house, and the affiliations of the perpetrators of the predicate crimes in this case. *See* 125 RT 7633, 7646; 126 RT 7700–02,

7716–19, 7732. Kilmer also relied on police reports to discern information about the predicate acts. 126 RT 7716–19. And he relied on police reports, field investigation cards, and information from a police department database in forming his opinions. *See* 125 RT 7637; 126 RT 7745–46. Finally, he relied on certain physical evidence, including Petitioner's tattoos and items found as a result of a search of Petitioner's house during the time of the string of shootings in 2007. 125 RT 7624–25, 7663–66.

As an initial matter, there is no indication that the state court made an unreasonable determination of the facts to the extent it held that these statements were not solicited during police investigations seeking to establish a substitute for in-court testimony. In his brief before the state court, Petitioner cited only the transcript of Kilmer's testimony. *See* Appellant's Opening Brief, ECF 16-9, Ex. C (relying on Defendant Rojas's brief, ECF 16-9, Ex C1 at 58–66). Based on that testimony, the state court could have reasonably determined that the statements Kilmer relied upon from police contacts, police reports, field investigation cards, and his own conversations with officers and witnesses were all solicited in circumstances not constituting formal investigations.

For example, Petitioner notes that each of the interactions between officers and Petitioner are described as "contacts," whereby it is reasonable to determine that they were not solicited pursuant to formal investigative matters. *See* Pet. at 48–52; 125 RT 7625, 7631–32, 7639–40, 7655–59, 7661–65, 7667. Indeed, Kilmer testified that at least one of those contacts, in 2008, was during the department's "unofficial" Cinco de Mayo activities. 125 RT 7655. Though Petitioner was "detained," 126 RT 7764, there is no evidence that the statements were solicited as part of an ongoing investigation. Similarly, though Kilmer relied on police reports, there is no firm indication that these reports were drafted as part of an ongoing investigation into criminal activity, as opposed to serving as a log of interactions with known and potential gang affiliates for other legitimate police purposes.[4] 125 RT 7637; 126 RT 7745–46. Kilmer even described the police

---

[4] Petitioner's strongest argument as to reports and conversations being testimonial relates to Kilmer's testimony on the predicate acts. Kilmer testified that he relied on conversations he had with other officers "in helping form [his] opinion on this case" and on the "the predicate report[s]" of the crimes. 126 RT 7716–19. This information alone does not present clear and convincing

database on which he relied as including informal contacts such as street stops of individuals and

identifications of vehicles registered to gang members. *See* 125 RT 7637. Petitioner has provided

no evidence, much less clear and convincing evidence, that such information was collected during

ongoing investigations. As such, the state court's determination of the facts was reasonable.

In arguing that the state court's decision was contrary to or an unreasonable application of

clearly established law, Petitioner relies on *Davis v. Washington*, 547 U.S. 813 (2006), *Bullcoming*

*v. New Mexico*, 564 U.S. 647, 652 (2011), and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305,

308 (2009).[5] *See* Pet. at 57. He claims that these cases clearly establish that when a police

department maintains police-contact records, it is a "strong indicator that the records were

prepared and retained for use in court"—that is, that the records are testimonial. Pet. at 57. And

in this case, he says, some of the contacts were made during the string of shootings at issue and

when the police department was "very, very busy," further indicating that the contacts were

"undertaken to investigate the very crimes charged," *id.*, and that the contacts were "methodically

catalogued precisely for future reference in future gang prosecution," Trav. at 12.

None of the cases Petitioner cites support these propositions. Both *Bullcoming* and

*Melendez-Diaz* are wholly inapposite, dealing not with police contacts or investigations, but rather

with the reports and conclusions produced as a result of expert forensic analyses. *Davis*, by

contrast, did deal with police investigations, distinguishing statements made to police about events

during an ongoing emergency, 547 U.S. at 826–27, from statements detailing past events,

specifically those given in response to an investigation "into possible criminal past conduct," *id.* at

---

evidence that the conversations and reports were procured with the primary purpose of obtaining
testimony. But even if they were testimonial, as noted, Petitioner does not challenge the state
court's determination that Kilmer must have introduced the *contents* of the testimonial statements
in order for there to be a Confrontation Clause issue. *See* Op. at 26–28. At least as to these
statements, the record is clear that Kilmer never introduced the contents of any statements from
the police reports or conversations concerning the predicate acts. On direct examination, the
prosecutor asked Kilmer whether he had an opinion on whether each predicate act was committed
by an El Hoyo Palmas gang member, to which he answered "yes" without revealing the statements
upon which he relied in forming that opinion. *See* 126 RT 7716–19. As such, the state court
reasonably held that the predicate act testimony was admissible.
[5] Petitioner also relies heavily on the California Supreme Court decision in *People v. Sanchez*, 63
Cal. 4th 665 (2016) to support his arguments. But Petitioner must demonstrate why the state court
decision here was an unreasonable application of "Federal law[] as determined by the Supreme
Court of the *United States*." *See* 28 U.S.C. 2254(d)(1) (emphasis added).

829 (citing *Crawford*).  But *Davis* does not speak to the scenario at issue here, involving seemingly informal police contacts, not explicitly tied to an ongoing criminal investigation, the records of which are then maintained by the police department.  Indeed, Petitioner points only to cases in which the investigation was clearly targeted at "possible criminal past conduct"—which is not the case here, where the records were allegedly catalogued for use in *future* investigations.  And even as to the contacts made during the "busy" period during the string of shootings at issue, there is no evidence that these contacts were made to investigate those shootings.  As such, the state court's decision was not an unreasonable application of or contrary to clearly established law.

The state court thus reasonably concluded that the trial court's admission of Detective Kilmer's expert testimony relying on out-of-court statements did not violate Petitioner's Confrontation Clause rights under the Sixth and Fourteenth Amendments.

## V.  CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be DENIED.

Further, a Certificate of Appealability is DENIED.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED.**

Dated: August 31, 2018

BETH LABSON FREEMAN
United States District Judge